**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Ahmad Alsadi and Youssra Lahlou, husband and wife,

Plaintiffs,

vs.

Intel Corporation, a Delaware corporation,

Defendant.

No. CV-16-03738-PHX-DGC

**ORDER**

Defendant Intel Corporation has filed several *Daubert* motions, a motion to limit the testimony of Plaintiffs' rebuttal experts, and a motion for summary judgment. Docs. 144-47, 163, 183.  The parties also have filed a combined eight motions to strike. Docs. 154-55, 159-61, 167, 187, 200.  The motions are fully briefed, and oral argument will not aid in the Court's decision.  *See* Fed. R. Civ. P. 78(b).  For reasons stated below, the Court will grant the *Daubert* motions in part, grant the motion to limit the testimony of Plaintiffs' rebuttal experts, deny the motions to strike, and deny summary judgment in part.

## I.    Background.

Intel owns an industrial wastewater system ("IWS") housed in the CH-8 building of its technology development campus in Chandler, Arizona.  Technicians at Jones Lange LaSalle ("JLL") help operate the IWS.  Plaintiff Ahmad Alsadi worked for JLL as a HVAC technician at Intel's Chandler campus.

On February 28, 2016, an overdose of the chemical Thio-Red caused the IWS to emit hydrogen sulfide ("H$_2$S") and potentially other toxic gases. CH-8 and the nearby CN-3 building, where Alsadi was working at the time, were evacuated. Alsadi and other JLL employees were assembled in an area southwest of CH-8. Alsadi began experiencing a tingly throat, cough, headache, and watery eyes. He was evaluated by a nurse and then taken to an urgent care facility for treatment.

Plaintiffs filed suit against Intel in September 2016. Doc. 1-2 at 5-8. The second amended complaint asserts negligence and loss of consortium claims. Doc. 20. Plaintiffs allege that as a result of Alsadi's exposure to toxic gases, he has experienced coughing, pulmonary and respiratory distress, and other injuries requiring medical care. *Id.* ¶ 21. Alsadi seeks damages for his alleged injuries and future medical care. *Id.* ¶ 26. He claims that he has reactive airways dysfunction syndrome ("RADS") which has rendered him permanently disabled. *See* Docs. 161 at 5, 195 at 3.

The case was recently transferred to the undersigned judge with the motions already pending. The Court will summarily deny the motions to strike.[1]

## II. Intel's *Daubert* Motions.

### A. Rule 702 and *Daubert*.

Intel seeks to exclude expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Under Rule 702, an expert may offer "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on

---

[1] Plaintiffs move to strike the *Daubert* motions, claiming that they essentially are motions in limine limited to three pages with no reply brief under Local Rule of Civil Procedure 7.2. *See* Docs. 159-61 at 2-4. Judges in this district, including the undersigned judge, generally do not consider *Daubert* motions to be motions in limine. Moreover, Plaintiffs stipulated to the filing of reply briefs. Doc. 152 at 2. Plaintiffs complain that Intel did not meet and confer with them before filing the motions (citing LRCiv 7.2(l)), but this clearly would not have changed the briefing as shown by Plaintiffs' opposition to the motions. Plaintiffs' motions to strike the *Daubert* motions will be denied.

"sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of expert testimony has the ultimate burden of showing, by a preponderance of the evidence, that the proposed testimony is admissible under Rule 702. *See Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); Fed. R. Evid. 104(a). The trial court acts as a gatekeeper for expert testimony to assure that it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

Plaintiffs emphasize the statement in *Daubert* that a district court should conduct the admissibility analysis with a "liberal thrust" favoring admission. Doc. 161 at 6; *see Daubert*, 509 U.S. at 588. The Court will follow this guidance, but with the understanding that the Court may admit expert opinions only if it can determine that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence. *See* Fed. R. Evid. 104(a); *Daubert*, 509 U.S. at 592 & n.10; *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).[2]

## B. Intel's Motion to Exclude Opinions of Dr. Anselmo Garcia.

Dr. Anselmo Garcia is a pulmonologist with Arizona Chest and Sleep Medicine. He began treating Alsadi in March 2016. He prepared a two-and-a-half page letter, dated April 23, 2017, in which he reviews Alsadi's medical treatment and reaches certain conclusions as to Alsadi's diagnosis, the cause of his injuries, and his prognosis. Doc. 148-4 at 2-4. In July 2017, Plaintiffs disclosed Dr. Garcia as an expert to testify about: (1) Alsadi's history, examinations, treatments, tests, findings, diagnosis, and prognosis, including the permanent nature of his injuries; (2) the reasonableness of the treatments and their costs; (3) the cause of Alsadi's injuries; and (4) the opinions expressed in the April 23 "letter report." Docs. 148-3 at 123, 161 at 7-8.

---

[2] Plaintiffs request a *Daubert* hearing in passing, but they do not explain what would be done at the hearing, and their responses to Defendants' motions set forth a complete explanation of their position, including citations to many sources in support of their experts' opinions. In light of the full briefing provided by both sides, the Court concludes that a *Daubert* hearing is not necessary.

Intel argues that Dr. Garcia should be precluded from offering his causation opinions because the opinions fail to meet Rule 702's requirements for admissibility. Doc. 145 at 1-3. The Court agrees.[3]

In his April 23 letter, Dr. Garcia states that exposure to $H_2S$ can cause the following injuries and symptoms:

> In low levels of exposure there can be irritation to the eyes, nose, and throat. Exposure, even at relatively low concentrations can cause painful dermatitis and burning of the eyes. In the respiratory tract, exposure can lead to immediate or delayed pulmonary edema. Pulmonary manifestations at low concentrations [of] 50 ppm can cause cough, shortness of breath, and bronchial or lung hemorrhage. Long term irritation with cough and bronchospasm can be a complication. At higher concentrations bronchitis and pulmonary edema can develop. Due to severe dyspnea and edema individuals can develop cyanosis and . . . severe exposure can lead to death.

Doc. 148-4 at 3.

Dr. Garcia does not provide the basis for these general causation opinions. He cites no medical literature or independent research concerning the effects of $H_2S$ exposure, and he describes no clinical experience he may have treating patients exposed to $H_2S$. Nor does he identify the principles and methods he used to reach his conclusions.[4]

With respect to the specific cause of Alsadi's injuries, Dr. Garcia states that, "as a result his exposure, [Alsadi] has recurrent exacerbations with severe bouts of shortness of breath and cough limiting his ability to work and complete his activities of daily living." *Id.* at 3-4. Dr. Garcia further states that Alsadi "will continue to suffer from recurrent

---

[3] Intel further argues that Dr. Garcia should be precluded from offering his prognosis opinion that Alsadi is at risk for lung disease and a possible lung transplant in the future. *Id.* Plaintiffs have withdrawn this opinion. Doc. 161 at 3, 18.

[4] Plaintiffs cite the definition of RADS provided by the National Center for Biotechnology Information ("NCBI"), which includes exposure to $H_2S$. Doc. 161 at 11. Although Dr. Garcia referenced the NCBI definition of RADS in his deposition to describe the purported differences between RADS and reactive airway disease (Doc. 161-2 at 84), his letter does not state that he relied on the definition in reaching his causation opinions in this case.

reactive airway disease requiring ongoing long term therapy and he may develop further complications from this injury[,] including worsening shortness of breath, pulmonary fibrosis, persistent cough with a chance of progressive lung injury where [o]xygen therapy may be needed." *Id.* at 4.[5]  Again, however, Dr. Garcia does not provide a basis for these conclusions.

Under Rule 702, an expert must explain the basis for his conclusions in a manner that allows the Court to determine whether he is using reliable principles and methods and is applying them to the facts of the case in a reliable manner.  Fed. R. Evid. 702(c)-(d).  The gap between foundational facts and the expert's conclusions cannot be bridged merely by the mere *ipse dixit* – the say-so – of the expert.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  By his own admissions, Dr. Garcia offers nothing more than *ipse dixit*.

In his deposition, Dr. Garcia described his role in this case and the purpose of his April 23 letter as follows:

> When I was asked to do this, it was never to write an expert report.  It was simply to write my understanding of Mr. Alsadi's current condition while I was taking care of him and my concerns as to his overall care and where he was at.
>
> So to say I wrote an expert report, I don't know if I'd say I went through and tried to do all of the literature search that I would normally do and so forth.  I simply wrote him a letter as his treating physician and what my concerns were at the time. . . .
>
> I was never told you are an expert witness, . . . or please write down your expert report, because it would have been a much more comprehensive statement than a two-and-a-half page to whom it may concern, thank you very much kind of thing.

Doc. 148-3 at 102.

---

[5] Dr. Garcia considers reactive airways disease and RADS to be the same condition. *See* Doc. 148-3 at 118.

Dr. Garcia also confirmed that while he was Alsadi's treating physician, he is not a medical or legal expert witness in this case. *Id.* at 103, 106. In fact, Dr. Garcia was "completely taken by surprise" to learn that he had been disclosed as an expert witness given assurances from Alsadi's counsel that he would "never need to testify or be part of this [case]." *Id.* at 106. Dr. Garcia made clear that he would not be comfortable telling a jury, from a medical or legal standpoint, that Alsadi's injuries were caused by exposure to $H_2S$ because he would first "have to do a lot more review, and that's not something [he's] ever been asked to do." *Id.* at 107.

As a treating physician, Dr. Garcia was not required to produce an expert report under Rule 26(a)(2)(B). *See* Fed. R. Civ. P. 26(a)(2)(B). If Plaintiffs intended to call him to testify about his treatment of Alsadi, they instead were required to disclose only "the subject matter on which the witness is expected to present evidence under Rule 702" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

Dr. Garcia was excused from the more detailed report requirement, however, only if his testimony was limited to opinions he formed during the course of his treatment of Alsadi. If Plaintiffs intended to have him present opinions developed beyond the course of treatment, then a Rule 26(a)(2)(B) report was required for those additional opinions. *See Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817 (9th Cir. 2011). That report must include a complete statement of the testimony Dr. Garcia would provide at trial on the additional opinions, as well as the basis and reasons for those opinions. Fed. R. Civ. P. 26(a)(2)(B). Plaintiffs produced no such report. The two-page letter written by Dr. Garcia does not comply with the requirements of Rule 26(a)(2)(B), and Plaintiffs emphasize repeatedly in their response to the *Daubert* motion that he is testifying only as a treating physician. Given the requirements of Rule 26, the limited nature of Dr. Garcia's letter, and the Ninth Circuit's decision in *Goodman*, Dr. Garcia will not be permitted at trial to give opinions beyond those formed during the course of his treatment of Alsadi. As noted

above, Dr. Garcia testified in his deposition that those treatment-related opinions do not include the research, analysis, or testing designed to determine the precise cause of Alsadi's condition.[6]

Plaintiffs assert that Dr. Garcia's investigation of Alsadi's medical condition and its cause has been in furtherance of Alsadi's treatment, and that Dr. Garcia used the word "causation" not in the "medical/legal" sense, but as a treating doctor. Doc. 161 at 7-8 (citing Doc. 161-2 at 10). But this does not change the fact that any testimony Dr. Garcia might give about the cause of Alsadi's injuries would be expert opinion under Rule 702. His "causation opinion is an expert opinion under [Rule] 702 because it requires training, education, and specialized knowledge." *Alfaro v. D. Las Vegas, Inc.*, No. 2:15-CV-02190-MMD-PAL, 2016 WL 4473421, at *10 (D. Nev. Aug. 24, 2016); *see United States v. Urena*, 659 F.3d 903, 908 (9th Cir. 2011) (agreeing with the Second and Eleventh Circuits that "a physician's assessment of the cause of an injury is expert testimony"); *Gyrodata Inc. v. Atl. Inertial Sys. Inc.*, No. CV-08-7897-GHK (FMOx), 2011 WL 13116732, at *3 (C.D. Cal. Oct. 11, 2011) (treating doctor "opinions fall within Rule 702 when they are used to explain the causation of that condition"); *Anderson v. Hess Corp.*, 592 F. Supp. 2d 1174, 1178 (D.N.D. 2009) ("A treating physician's expert opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation.").

Plaintiffs further assert that the factual basis of an expert opinion goes to the credibility of the testimony, not its admissibility. Doc. 161 at 8. But Intel does not merely challenge the factual basis for Dr. Garcia's opinions; Intel also argues that the opinions are not the product of reliable principles and methods. The requirements of Rule 702 – including that the opinion be supported by an adequate factual basis – are conditions for

---

[6] For this reason, the many scientific sources cited by Plaintiffs in their response to the *Daubert* motion are inapposite. Those sources were not considered by Dr. Garcia, were not cited in a Rule 26(a)(2)(B) report, and Plaintiffs cannot rely on them as the basis for his opinion in this case.

admissibility, and the Supreme Court has made clear that the "trial judge must determine at the outset, pursuant to Rule 104(a)," whether the expert's testimony is admissible under Rule 702. *Daubert*, 509 U.S. at 592.

Plaintiffs' reliance on *D'Agnese v. Novartis Pharmaceuticals Corp.*, No. CV-12-00749-PHX-JAT, 2013 WL 321773 (D. Ariz. Jan. 28, 2013), is misplaced. Doc. 161 at 8-9. No *Daubert* hearing was needed in that case because it was unclear whether the experts actually intended to offer causation opinions. *D'Agnese*, 2013 WL 321773, at *3. The court was "concerned that a ruling based on opinions that are not actually being offered by these witnesses would be an opinion on an issue that is not ripe and would be advisory." *Id.* at *3 n.2. Although Plaintiffs have withdrawn Dr. Garcia's opinion that Alsadi is at risk for lung disease and may need a lung transplant in the future (Doc. 161 at 5, 18), they continue to assert that Dr. Garcia should be permitted to opine that RADS "was a product of [Alsadi's] toxic inhalation on Intel's campus" (*id.* at 5). This case is not like *D'Agnese*.

Plaintiffs argue that Dr. Garcia is a board-certified pulmonologist and, based on his treatment of Alsadi, he is "firm in his well-founded opinion that exposure to [$H_2S$] caused RADS." Doc. 161 at 14-15. But the mere fact that Dr. Garcia is a qualified pulmonologist who treated Alsadi does not render his opinions on causation admissible under Rule 702 and *Daubert*. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.").

Plaintiffs assert that Dr. Garcia "did not equivocate" in his causation opinions. Doc. 161 at 14. But a lack of equivocation does not satisfy the requirements of Rule 702, and Dr. Garcia made clear in his deposition that he did not do the work necessary to state causation opinions under that rule. Doc. 161-2 at 4.

Plaintiffs contend that Dr. Garcia's specific causation opinion is reliable because it is based on a differential diagnosis. Doc. 161 at 16-18. But the first step in a proper differential diagnosis "is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Clausen v. M/V NEW CARISSA*,

339 F.3d 1049, 1057 (9th Cir. 2003). "The issue at this point in the process is which of the competing causes are *generally* capable of causing the patient's symptoms or mortality. Expert testimony that rules in a potential cause that is *not* so capable is unreliable." *Id.* at 1057-58 (emphasis in original). In addition to the fact that Dr. Garcia does not describe the process or basis for any differential diagnosis in his letter, he does not first show that $H_2S$ is capable of causing RADS. *See id.*; *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1413 (D. Or. 1996) ("[I]t is . . . important to recognize that a fundamental assumption underlying [differential diagnosis] is that the final, suspected 'cause' . . . must actually be capable of causing the injury.").

Nor have Plaintiffs shown that Dr. Garcia actually performed a proper differential diagnosis. To perform such a diagnosis, Dr. Garcia must identify "all of the potential hypotheses that might explain [Alsadi's] symptoms, [and] must then engage in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in [this] case." *Clausen*, 339 F.3d at 1058. Dr. Garcia "must provide reasons for rejecting alternative hypotheses 'using scientific methods and procedures' and the elimination of those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'" *Id.* (quoting *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)).

Dr. Garcia acknowledged that Alsadi's symptoms could be caused by various medical conditions. Doc. 161-2 at 39. In his April 23 letter, Dr. Garcia identified a host of conditions – allergies, acid reflux, neurogenic cough, acute infection, and vocal cord abnormality – that potentially could cause Alsadi's symptoms. Doc. 148-4 at 2-3. But instead of ruling out these conditions, Dr. Garcia continued Alsadi on therapy for them. *Id.* at 2; *see Goodwin v. Danek Med., Inc.*, No. CV-S-95-433-HDM(RJJ), 1999 WL 1117007, at *2 (D. Nev. July 8, 1999) ("There is no evidence that Dr. Yarus undertook any differential diagnosis to eliminate other possible causes of Goodwin's pain. His opinion is

based solely on the fact that Goodwin had screws implanted and that there was pain. Such reasoning has been rejected in other cases.") (citations omitted).[7]

In summary, Plaintiffs have not shown by a preponderance of the evidence that Dr. Garcia's causation opinions are based on sufficient facts or data to which reliable principles and methods have been applied reliably. The causation opinions therefore are not admissible under Rule 702(b)-(d).[8]

## C. Intel's Motion to Exclude Opinions of Dr. Charles Landers.

Dr. Landers is board-certified in internal, pulmonary, and critical care medicine. He works with the Chest Medicine and Critical Care Medical Group. He has privileges at Sharp Memorial Hospital in San Diego. Doc. 148-4 at 14.

Dr. Landers prepared a rebuttal report dated February 22, 2008. *Id.* at 13-41. He opines in part that Alsadi had a significant exposure to $H_2S$ and other toxic gases at the Intel campus and developed RADS. *Id.* at 35-36. Intel argues that Dr. Landers's causation opinion is inadmissible under Rule 702 because it based not on reliable scientific principles and methods, but rather on the timing of the exposure and onset of symptoms. Doc. 146 at 3, 6-13. Intel further argues that Dr. Landers's diagnosis of RADS is not based on a reliable methodology. *Id.* at 13-16.[9]

### 1. Causation Opinion.

Dr. Landers reviewed Alsadi's medical records, reports of Intel's experts and independent medical evaluators, Intel's emergency response plans, a material safety sheet

---

[7] Plaintiffs' citation to *Anderson* is inapposite. Doc. 161 at 17. The medical expert in that case "ruled out other possible causes of [the plaintiff's] symptoms," and his differential diagnosis "was for the purpose of identifying not only [the plaintiff's] condition, but also the cause of that condition." *Anderson*, 592 F. Supp. 2d at 1183.

[8] As noted, Plaintiffs have withdrawn Dr. Garcia's prognosis opinion that Alsadi is at risk for lung disease and a possible lung transplant in the future. *See* Doc. 161 at 3, 18. Dr. Garcia therefore is precluded from offering this opinion at trial.

[9] Intel moves to preclude Dr. Landers from testifying about Alsadi's prognosis (*id.* at 1), but presents no supporting argument. The Court will deny the motion in this respect.

for Thio-Red, and certain discovery materials. Doc. 148-4 at 13-14. He provides a thorough account of Alsadi's medical history in his rebuttal report. *Id.* at 14-35. He then offers these opinions (*id.* at 35):

- Alsadi had a significant exposure to toxic industrial gases on 2/28/16. The information is compatible with Thio Red, $H_2S$ and possibly other toxic gases.

- Alsadi develop[ed] RADS thereafter and continues to suffer from [shortness of breath], cough, wheezing and external limitations, despite ongoing therapy.

Dr. Landers concludes that, as a result of his exposure to toxic gases at the Intel campus, Alsadi "has experienced extensive resulting changes including[] RADS[.]" *Id.* at 36.

Dr. Landers does not explain the basis for this conclusion. Although his Rule 26(a)(2)(B) report includes a lengthy account of Alsadi's medical history and symptoms, Dr. Landers does not bridge the gap between these foundational facts and his causation opinion with any reliable principle or method. His opinion that Alsadi's exposure to toxic gases caused RADS is nothing more than unvarnished *ipse dixit*.[10]

In his deposition, Dr. Landers relied on the temporal proximity between the exposure and Alsadi's symptoms, claiming that it is not a mere coincidence that Alsadi was exposed to toxic gases and thereafter developed RADS:

I think that RADS from toxic industrial gas exposure is the best fit for the data that we have about Mr. Alsadi from day one to now. I think the information is compatible with Thio-Red[,] hydrogen sulfite[,] and other toxic gases, unknown amount, unknown duration, unknown mix of multiple gases. I think . . . the information that we have is that's the best fit. I don't think it's a coincidence. I think he got exposed to gases, and now he's disabled.

_____

[10] Dr. Landers interviewed Alsadi via Facetime and the interview notes are attached to his report (*see id.* at 35, 43-47), but he does not explain how the notes support his opinions.

*Id.* at 57; *see also id.* at 55 ("This is not a coincidence that suddenly on the 28th of February [Alsadi] . . . got short of breath[.]  This is not a coincidence that he developed asthma out of the blue in the setting of this.  This is the cause.").

"It is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Rule] 702."  *Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900, 906 (M.D. Fla. 1996) (quoting Federal Judicial Center's Reference Manual on Scientific Evidence); *see Daubert*, 43 F.3d at 1319 (excluding opinion that Bendectin caused the plaintiffs' birth defects where the expert relied on "the timing of their mothers' ingestion of the drug"); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (the district court was "correct in viewing with skepticism [the expert's] reliance on the temporal proximity between the exposure and injury"); *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 611 (7th Cir. 1993) (causation opinions properly excluded where they were based "merely on the temporal relationship between the ingestion of ibuprofen and the injury"); *Lassalle v. McNeilus Truck & Mfg., Inc.*, No. 16-CV-00766-WHO, 2017 WL 3115141, at *5 (N.D. Cal. July 21, 2017) (excluding causation opinion where the "temporal connection between the events made up [the expert's] mind that a purported explosion event caused the decedent's eventual brain death"); *Prall v. Ford Motor Co.*, No. 2:14-CV-001313-MMD-GWF, 2017 WL 361545, at *4 (D. Nev. Jan. 24, 2017) ("[The expert] concludes that the existence of one event after the existence of another is sufficient to prove the first event caused the second.  This is a logical fallacy – *post hoc ergo propter hoc*.  While the existence of the [throttle] problem is necessary to conclude that it was the cause of the accident, it is not, in itself, sufficient to establish causation.").

Plaintiffs note that testimony about a doctor's own clinical experiences is not mere speculation.  Doc. 160 at 9.  But Dr. Landers does not rely on his own clinical experience in forming his causation opinion.  He has never treated a patient exposed to $H_2S$.  *See* Doc. 148-4 at 50-53.

Plaintiffs assert that Dr. Landers's causation opinion is grounded in the "sound application of the principles and methodology of his discipline." Doc. 160 at 8. But no specific principles are identified. *Id.* Plaintiffs do claim that Dr. Landers performed a differential diagnosis to determine causation by "consider[ing] numerous variables, including the details of the exposure, the temporal relationship between exposure and symptom onset, the symptoms themselves, the correlation with those typically associated with RADS, the lack of preexisting conditions, and the lack of alternative explanations." Doc. 160 at 9. But Plaintiffs cite no portion of Dr. Landers's report to support this assertion, nor do they explain how Dr. Landers's purported consideration of the numerous variables led him to conclude that the exposure event caused RADS. Dr. Landers himself does not claim to have performed a differential diagnosis to establish causation, and, as explained above, he does not sufficiently bridge the analytical gap between the medical history recounted in his report and his conclusion that the exposure event caused RADS.

Under Rule 702 and *Daubert*, the proponent of expert scientific testimony "must explain precisely how [the expert] went about reaching [his] conclusions[.]" *Daubert*, 43 F.3d at 1319. Plaintiffs provide no such explanation for Dr. Landers's causation opinion. Instead, Plaintiffs rely entirely on "unadorned assertions that the methodology [he] employed comports with standard scientific procedures." *Id.* Rule 702 and *Daubert* require more. *See id.*; *Moore*, 151 F.3d at 279 (affirming the district court's finding that "the 'analytical gap' between [the expert's] causation opinion and the scientific knowledge and available data advanced to support that opinion was too wide"); *Cartwright*, 936 F. Supp. at 906 (excluding opinion where the expert "fail[ed] to identify what 'methodology' he did employ, other than reliance on the sequence of events").

Plaintiffs have not shown by a preponderance of the evidence that Dr. Landers's causation opinion is based on reliable principles and methods applied reliably to the facts of this case. The opinion therefore is not admissible under Rule 702(c)-(d).

### 2. Diagnosis Opinion.

Dr. Landers describes RADS and the treatment it requires as follows:

[RADS] is asthma resulting from a single exposure to a high concentration of irritant agents or a repeated exposure to moderate to low levels of irritant agents. The asthma developed in RADS is new. It is not immune mediated. (see attached Chapter from Up to Date: [RADS] and Irritant Induced Asthma).

RADS may resolve with treatment or become chronic and require long term treatment for asthma or bronchial hyperactivity. The asthma treatments would be the same as other types of asthma. Inhaled anti-inflammatory drugs are used as "controllers" with inhaled steroids. Inhaled long acting bronchodilators help minimize symptoms. Short acting rescue inhalers can help quickly reduce chest tightness and bronchospasms.

Doc. 148-4 at 16.

As noted, Dr. Landers discusses Alsadi's medical history at length. He starts this discussion by explaining that Alsadi was a healthy man without respiratory symptoms or asthma prior to the exposure event. *Id.* at 14. Dr. Landers then describes Alsadi's continuing treatment with Dr. Garcia and other medical providers for shortness of breath, wheezing, chronic cough, bronchospasms, and chest pain. *Id.* at 14-35. Dr. Landers also offers rebuttal opinions challenging the opinions of Intel's experts that Alsadi does not suffer from RADS. *Id.* at 29-39. Dr. Landers ultimately concludes that, based upon the two years of persistent cough, wheezing, and other asthma-related symptoms, it is highly likely that Alsadi has RADS. *Id.* at 17. He notes that this was the diagnosis of Alsadi's treating physician, Dr. Garcia, and that he agrees with Dr. Garcia's overall assessment and treatment of Alsadi. *Id.* at 17, 37.

Intel does not dispute that Dr. Landers is qualified to diagnose an individual with RADS. Nor does Intel contend that he relied on insufficient facts and data to reach his diagnosis. Instead, Intel relies on opinions of its own expert, Dr. Gerald Schwartzberg, to argue that Dr. Landers's methodology suffers from four deficiencies. Doc. 146 at 14.

First, Intel contends that there is no evidence that Alsadi was exposed to high levels of toxic gas. *Id.* Dr. Landers, according to Intel, assumed that Alsadi was exposed to a higher level of $H_2S$ than the 11.7 ppm measured nearly an hour after the release. *Id.* But

Intel does not explain why any such assumption would be unreasonable in this case, particularly when there was no constant, real-time monitoring of $H_2S$ levels during the exposure event.

Second, Intel criticizes Dr. Landers for accepting Alsadi's representation that he had no respiratory problems before the exposure. *Id.* at 14-15. But self-reported patient histories "provide information upon which physicians may, and at times must, rely in their diagnostic work." *Todd v. Baker*, No. CV 10-127-M-DWM, 2012 WL 1999629, at *3 (D. Mont. June 4, 2012) (citations omitted). Intel will be free to challenge the credibility of Alsadi's self-reported medical history through cross-examination and rebuttal evidence. *See id.*

Third, Intel contends that Dr. Landers misinterpreted Alsadi's pulmonary function tests ("PFTs"). *Id.* at 15. Intel claims that Dr. Landers "fixated" on the results of a single PFT and failed to consider the effect of Alsadi's weight and effort level. *Id.* Dr. Landers and Dr. Schwartzberg clearly disagree as to the results of Alsadi's PFTs (*see* Doc. 160-8 at 12), but this is no basis for excluding Dr. Landers's diagnosis.

Fourth, Intel contends that Dr. Landers's methodology is deficient because he performed no methacholine challenge test. Doc. 146 at 16. Intel claims that such tests are routinely used to diagnose RADS. *Id.* Dr. Landers agrees that the test could confirm a RADS diagnosis, but explains that it is not appropriate to subject a patient with abnormal pulmonary functions to the potential hazard of doing a methacholine challenge. Doc. 160-8 at 130. Intel does not address this point in its briefing.

Given Dr. Landers's scientific knowledge, training, and experience as a board-certified pulmonologist, and his extensive review of Alsadi's medical history and ongoing symptoms, Plaintiffs have shown that his diagnosis of RADS is sufficiently reliable to be admissible under Rule 702. Doc. 160 at 6, 13-6. Intel's criticisms of his diagnosis may be appropriate subjects for cross-examination, rebuttal expert testimony, and jury argument, but they do not so undercut Dr. Landers's opinion as to render it inadmissible under Rule 702. Intel's motion to exclude will be denied in this regard.

**D.    Intel's Motion to Exclude the Opinions of Dr. Kelly Johnson-Arbor.**

Dr. Johnson-Arbor is board-certified in emergency medicine and toxicology. She is the attending physician for the toxicology clinic at MedStar Georgetown University Hospital. She teaches toxicology at Georgetown University and the Connecticut Poison Control Center. Doc. 148-4 at 65.

Plaintiffs retained Dr. Johnson-Arbor to address the significance of Alsadi's exposure to $H_2S$ on February 28, 2016, the peak $H_2S$ concentration of 11.7 ppm that was measured in the CH-8 building on that date, and the possible health effects of such an exposure. *Id.* at 66. She prepared a rebuttal report dated March 14, 2018. *Id.* at 65-68. She opines that Alsadi was exposed to concentrations of $H_2S$ higher than 11.7 ppm, he has RADS, and his exposure to $H_2S$ caused his RADs. *Id.* at 67. Intel argues that each of these opinions is inadmissible under Rule 702 and *Daubert*. Doc. 147. The Court agrees.

**1.    Exposure Opinion.**

Dr. Johnson-Arbor acknowledges that it is impossible to determine the exact concentration of $H_2S$ to which Alsadi was exposed on the date of the incident. Doc. 148-4 at 66. She concludes, however, that because "the $H_2S$ concentration of 11.7 ppm was measured more than 45 minutes after the noxious odor was first reported and well after the first reports of symptomatic patients, this measurement more likely than not represents an inaccurate reflection of the $H_2S$ concentrations[.]" *Id.* at 67.

In her deposition, Dr. Johnson-Arbor explained that the concentration of gas to which a person will be exposed depends on "many factors," including where the person is located in relation to the exposure's source and wind directions. Doc. 148-3 at 70. She acknowledged, however, that she does not know exactly where Alsadi was exposed to $H_2S$ on the Intel campus and did not focus on where the exposure happened in reaching her opinion. *Id.* at 69; *see* Doc. 159-6 at 11-13. She further stated that she has done only informal research on how gases migrate. Doc. 148-3 at 70.

Intel argues that Dr. Johnson-Arbor's exposure opinion is inadmissible because she is not qualified to opine on the flow of gases and knows nothing about the "many factors"

in this case relevant to Alsadi's exposure to $H_2S$.  Doc. 147 at 10-11.  Plaintiffs do not address this argument in their response.

Dr. Johnson-Arbor asserts that because mucous membrane irritation occurs at $H_2S$ concentrations of 50 ppm, Alsadi was likely exposed to a higher concentration of $H_2S$ than the reported peak of 11.7 ppm.  Doc. 148-4 at 66-67.  But she cites no medical literature or other scientific basis for the proposition that mucous membrane irritation occurs at $H_2S$ concentrations of 50 ppm.[11]

Plaintiffs have not shown by a preponderance of the evidence that Dr. Johnson-Arbor is qualified to opine that Alsadi likely was exposed to concentrations of $H_2S$ higher than 11.7 ppm, or that this opinion is based on sufficient facts or data to which reliable principles and methods have been applied reliably.  The opinion therefore is not admissible under Rule 702.

## 2. Diagnosis Opinion.

Dr. Johnson-Arbor opines that Alsadi likely has RADS, not reactive airways disease.  Doc. 148-4 at 67.  She notes that exposures to significant concentrations of $H_2S$ have been "associated with the development of [RADS]" and that Alsadi's symptoms and medical treatment are "consistent with a diagnosis of RADS[.]"  *Id. see* Doc. 148-3 at 75. But merely stating that RADS is associated with high levels of $H_2S$ and consistent with Alsadi's symptoms is not sufficient to support a medical diagnosis of RADS under Rule 702.  *See Kolesar v. United Agri Prods., Inc.*, 412 F. Supp. 2d 686, 698 (W.D. Mich. 2006) (expert's opinion that the plaintiff's symptoms were "consistent with" RADS was properly excluded under Rule 702).

Moreover, by her own admissions, Dr. Johnson-Arbor is not qualified to diagnose RADS.  She does not recall ever treating a patient with RADS.  Doc. 148-3 at 56.  She repeatedly declined to answer questions about RADS in her deposition because she is not

---

[11] Intel contends that no evidence suggests that Alsadi actually experienced mucous membrane irritation.  Doc. 147 at 10.  But as Dr. Johnson-Arbor notes, Alsadi complained of a cough and sore throat at the time of the exposure.  Docs. 148-3 at 71, 148-4 at 65.

a pulmonologist. *Id.* at 54, 67, 72, 76. She was unable to describe the differences between RADS and reactive airway disease. *Id.* at 55. She could offer no opinion on the treatment for RADS, or whether obese people have more asthmatic conditions, because these issues were outside her area of expertise. *Id.* at 59, 72. When asked about the differing opinions on the results of Alsadi's PFTs, she "defer[red] those discussion to the pulmonary experts." *Id.* at 60; *see id.* at 75. She reiterated her opinion that Alsadi's symptoms "appear to be suggestive of RADS," but made clear that "[a] pulmonologist should review the records to definitively establish this diagnosis." *Id.* at 73.

Plaintiffs assert that Dr. Johnson-Arbor is qualified to diagnose RADS, but present no argument or evidence to support this assertion. Doc. 159 at 18. Instead, Plaintiffs "have opted to rely on an expert pulmonologist in order to avoid this very dispute." *Id.*; *see* Doc. 195 at 15 n.4. The Court will exclude Dr. Johnson-Arbor's opinion that Alsadi has RADS.[12]

### 3. Causation Opinion.

Dr. Johnson-Arbor opines that the exposure event "was temporally connected and directly responsible for [Alsadi's] subsequent diagnosis of pulmonary disease consistent with RADS." Doc. 148-3 at 67. The sole basis for this opinion is "[t]he fact that he had a chemical exposure, the fact that he was presumably healthy before that exposure, and then after the exposure he developed wheezing and asthma-like conditions." Doc. 148-3 at 58. But as explained above, an expert's causation opinion based solely on a temporal relationship is not derived from the scientific method and therefore is insufficient to satisfy the requirements of Rule 702. *Cartwright*, 936 F. Supp. at 906; *see Moore*, 151 F.3d at 278 (excluding causation opinion based solely on "the relatively short time between Moore's exposure to the chemicals and the onset of [RADS]").

---

[12] Plaintiffs contend that Dr. Johnson-Arbor may rely on Dr. Landers's diagnosis of RADS. *Id.* Although Dr. Johnson-Arbor could rely on opinions of other experts in reaching her own conclusions, she would not be permitted to parrot the opinions of other experts or to vouch for those experts. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6554163, at *2 (D. Ariz. Dec. 22, 2017).

Dr. Johnson-Arbor provides no basis for her causation opinion other than a temporal relationship. When asked how the exposure event caused Alsadi to develop RADS, she stated (Doc. 148-3 at 67):

> I'm not a pulmonologist. I am not an immunologist or anyone that studies the path of physiology of RADS so I would not want to even attempt to describe to you the physiological process that are involved in the development of RADS[.]

Plaintiffs contend that the causation opinion is based on a differential diagnosis. Doc. 159 at 11. But Plaintiffs do not explain how any such differential diagnosis would be reliable given that Dr. Johnson-Arbor is not qualified to diagnose RADS. Moreover, Dr. Johnson-Arbor performed no differential diagnosis in this case. She recognized that to establish a diagnosis of RADS, other similar conditions must be considered and eliminated, and this differential diagnosis "could include, but would not be limited to[,] RADS, reactive airways disease, vocal cord disfunction, [and] GERD." Doc. 159-6 at 6; *see* Doc. 148-4 at 67. But she only considered RADS and did not rule out the other conditions.

Plaintiffs have not shown by a preponderance of the evidence that Dr. Johnson-Arbor is qualified to render a causation opinion in this case or that her causation opinion is reliable. The opinion therefore is not admissible under Rule 702.[13]

### D. Intel's Motion to Exclude the Opinions of Greg Gerganoff.

#### 1. Gerganoff's Qualifications.

Generally speaking, Gerganoff opines that Intel failed to reasonably safeguard workers from a known hazardous condition and the failure caused Alsadi's injuries. *See* Doc. 180 at 13. Intel contends that Gerganoff is not qualified to render any such opinions because the opinions are not based on science and Gerganoff is not a medical doctor, chemist, engineer, or industrial hygienist. Doc. 163 at 3-7.

---

[13] Intel's motion to strike (Doc. 167) the new causation opinions in Dr. Johnson-Arbor's declaration (*see* Doc. 159-2) is denied as moot given the ruling above.

Rule 702 "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). "As the terms of the rule state, an expert may be qualified either by 'knowledge, skill, experience, training, or education.'" *Id.*

Gerganoff is a work-place safety expert whose opinions are based on his technical knowledge, training, and experience. *See* Doc. 164-3. He is a certified safety professional with 18 years of safety experience in the fields of manufacturing, construction, and oil and gas. *Id.* at 2-5. He is a member of the American Society of Safety Engineers. *Id.* at 4. He has operated his own consulting and expert witness firm, Rocky Mountain Safety Consulting, since 2014. *Id.* at 2. The mere fact that Gerganoff is not a doctor, scientist, engineer, or industrial hygienist does not make him unqualified to render safety opinions in this case. *See Thomas*, 42 F.3d at 1269 (district court erred in excluding expert testimony concerning safety conditions on a ship during the loading process where the witness had more than 20 years of experience as a longshoreman).[14]

Intel contends that Gerganoff is not qualified to interpret and apply OSHA standards to the facts of this case because he has never worked for OSHA, has never reported safety violations to OSHA, and has never worked or served as a consultant for an industrial waste treatment or semi-conductor manufacturing plant. Doc. 163 at 11. But Gerganoff has worked with OSHA during jobsite safety inspections and is an authorized OSHA trainer. Doc. 164-3 at 2-4. He has provided safety training on $H_2S$. Doc. 164-4 at 2. The Court finds that Gerganoff is qualified to provide testimony concerning relevant OSHA standards.

### 2. Gerganoff's Opinions.

Gerganoff prepared a 17-page expert report. Doc. 164-4. The report includes a statement of Gerganoff's qualifications, the bases for his opinions, and a summary of

---

[14] Gerganoff does not purport to provide opinions from a scientific perspective, but only from a safety standpoint. *See* Doc. 163 at 5 n.2, 8.

relevant facts. *Id.* at 2-4. His opinions in this case are set forth in seven separate sections of the report. *Id.* at 4-16.

Intel contends that certain opinions offered by Gerganoff in section two of his report are inadmissible because they are factually incorrect and otherwise based on Gerganoff's misunderstanding of the facts. Doc. 163 at 10-15. To support their respective arguments, each side sets forth its version of the events surrounding the $H_2S$ exposure at the Intel campus. *See* Doc. 163 at 3-4 (citing Doc. 145 at 3-6); Doc. 180 at 3-9. Many facts are genuinely disputed. *See id.* The Court cannot conclude on the present record that the opinions Gerganoff offers in section two of his report are based on insufficient facts and data. *See* Fed. R. Evid. 702(b). The Court will not grant the motion to exclude on this point. The parties can address their factual disagreements at trial, and Intel can object to any expert testimony it believes is inadmissible under Rule 702.

The Ninth Circuit has recognized that "safety standards such as those contained in OSHA assist 'a jury's determination of negligence because they represent the community's judgment as to what conduct is reasonable and what conduct is not.'" *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991) (citations omitted). Consistent with this authority, the Arizona Court of Appeals has held that "an OSHA standard may be considered as some evidence of the standard of care even when OSHA requirements are not binding on the defendant, so long as there is sufficient foundation (1) establishing that the standard at issue is directly related to the exercise of reasonable care and (2) a reasonable nexus exists between the proffered standard and the circumstances of the injury." *Wendland v. AdobeAir, Inc.*, 21 P.3d 390, 396 (Ariz. Ct. App. 2009).

Based in large part on the testimony of its rebuttal expert, Marshall Krotenberg (Doc. 165), Intel contends that Gerganoff's OSHA-based opinions set forth in sections three through seven of his report are inadmissible under *Wendland* because he misinterprets and misapplies OSHA standards (Doc. 163 at 15-17). But Gerganoff is not required to accept Intel's interpretation of the standards, and the Court cannot conclude on the present record that each of Gerganoff's OSHA-based opinions is admissible. Intel will be free to

cross-examine Gerganoff at trial and to object on the basis of relevancy, foundation, Rule 403, or other grounds.  The Court will rule on objections as they are made.  Intel's motion to exclude Gerganoff's opinions will be denied.[15]

### III.    Intel's Motion to Limit the Testimony of Plaintiffs' Rebuttal Experts.

Intel moves to preclude Plaintiffs from presenting testimony of their rebuttal experts – Dr. Johnson-Arbor, Dr. Landers, and Derrick Denis – in Plaintiffs' case-in-chief or in opposition to Intel's summary judgment motion, which does not rely on testimony of Intel's experts.  Doc. 144.  The Court will grant the motion.

The scheduling order in this case specifically limited rebuttal experts to "responding to opinions stated by initial experts."  Doc. 10 at 3.  As other courts have recognized, "[t]he principal objective of rebuttal is to permit a litigant to counter new, unforeseen facts brought out in the other side's case."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006).  "As such, rebuttal evidence may be used to challenge the evidence or theory of an opponent – and not to establish a case-in-chief."  *Id.*; *see Ellis v. Corizon, Inc.*, No. 1:15-CV-00304-BLW, 2018 WL 6268199, at *5 (D. Idaho Nov. 30, 2018) (precluding the plaintiff's rebuttal expert from testifying in the case-in-chief and noting that if defendants decided not to present their experts at trial, the plaintiff would be foreclosed from putting his rebuttal expert on the stand); *Danganan v. Am. Family Mut. Ins.*, No. 2:17-CV-02786-RFB-PAL, 2018 WL 3660198, at *4 (D. Nev. Aug. 2, 2018) (same); *Kirksey v. Schindler Elevator Corp.*, No. CV 15-0115-WS-N, 2016 WL 5213928, at *17 (S.D. Ala. Sept. 21, 2016) (same); *Palm Capital, LLC v. Travelers Prop. Cas. Co. of Am.*, No. CV-15-6385-DMG (PJWx), 2017 WL 5665010, at *2 (C.D. Cal. Apr. 3, 2017) (holding that the plaintiff would "be limited to using its rebuttal experts for just that – rebuttal – and may not call upon them to testify in its case-in-chief"); *Grove City Veterinary Serv., LLC v.*

---

[15] Intel's motions to strike Gerganoff's newly disclosed opinion and rebuttal report (Docs. 155, 187) are denied because the late disclosure of expert opinions is not a proper basis for a motion to strike under Local Rule 7.2(m).  Plaintiffs, however, will be limited to presenting only those opinions of Gerganoff that were timely disclosed.  *See* Fed. R. Civ. P. 37(c)(1).  Intel can object at trial to untimely opinions.

*Charter Practices, Int'l LLC*, No. 3:13-CV-2276-AC, 2016 WL 1573830, at *16 (D. Or. Apr. 19, 2016) (explaining that rebuttal testimony is not "an opportunity for the correction of any oversights in the plaintiff's case in chief") (citation omitted); *Sharma v. City of Vancouver*, No. C06-5688BHS, 2008 WL 11343467, at *2 (W.D. Wash. June 17, 2008) ("Until and unless Defendants' experts testify, Plaintiff's experts will be unable, as a practical matter, to truly rebut such testimony. Therefore, Plaintiff's rebuttal experts will be allowed to testify at trial only after Defendants' experts have testified."); *Santiago v. Select Portfolio Servicing, Inc.*, No. CV07-262-S-EJL, 2008 WL 4411392, at *5 (D. Idaho Sept. 25, 2008) ("Plaintiff will not be allowed to . . . use the rebuttal expert in her case-in-chief, instead, such an expert witness, if any, shall only be called as a rebuttal witness."); *Int'l Bus. Machines Corp. v. Fasco Indus., Inc.*, No. C-93-20326 RPA, 1995 WL 115421, at *3 (N.D. Cal. Mar. 15, 1995) ("[A] party can control the scope of the testimony of its adversary's rebuttal experts by limiting its own experts' testimony to a given subject matter. A party who forgoes designating experts on the initial disclosure date will thus find itself in a purely reactive mode, greatly restricted in its ability to offer expert testimony.").

For the same reason, district courts are "not required to consider rebuttal expert reports from a non-moving party at the summary judgment phase." *Ellis*, 2018 WL 6268199, at *4. "Rule 56 motions are designed to test the sufficiency of the non-moving party's case-in-chief, and weed out cases which cannot be successfully presented at trial[,] . . . and the "purpose of Rule 56 is best served by only considering evidence which the non-moving party could properly submit as part of its case-in-chief." *Id.*; *see Daggett v. United States*, No. 08-21026-CIV, 2010 WL 11553196, at *1 (S.D. Fla. Feb. 4, 2010) ("the plaintiffs cannot rely on experts designated solely as rebuttal experts in their case-in-chief to try to avoid summary judgment"); *Waste Servs., Inc. v. Waste Mgmt., Inc.*, No. 06-320, 2006 WL 5109230 at *1 (M.D. Fla. Dec. 1, 2006) (disallowing testimony of rebuttal expert on matters on which the plaintiff has the burden of proof at trial).

Plaintiffs do not address this legal authority. Instead, they cite this Court's ruling in *Bernal v. Daewoo Motor America, Inc.*, No. CV09-1502-PHX-DGC, 2011 WL 13183093, at *2 (D. Ariz. Aug. 31, 2011), precluding the plaintiffs from presenting rebuttal experts in their case-in-chief. Doc. 162 at 14. Plaintiffs claim that the issue in *Bernal* was whether the plaintiffs' experts "were first disclosed only as rebuttal witnesses in response to defense experts." *Id.* at 14-15. Plaintiffs assert that the ruling in *Bernal* should not apply in this case because Intel has been allowed to retain experts to counter Plaintiffs' rebuttal experts. *Id.* at 15.

The issue in *Bernal* was whether the plaintiff should be precluded from calling defense experts during the plaintiffs' case-in-chief, to be followed by testimony from the plaintiffs' rebuttal experts. 2011 WL 13183093, at *2. The defendant argued that "such a tactic would allow the plaintiffs to get their rebuttal experts into their case-in-chief through a 'back door' technique" that was inconsistent with the Court's case management order. *Id.* The Court concluded that "[p]ermitting the[] rebuttal experts to testify during [the plaintiffs'] case in chief would not be fair when the defense experts have not been permitted to state the full opinions that are being rebutted." *Id.* The Court further concluded:

> [T]he fairest result is to hold the parties to the order in which they chose to disclose their experts. Plaintiffs will be permitted to present the experts they disclosed in initial reports during their case in chief, Defendants will be permitted to present defense experts during their case in chief, and Plaintiffs will be permitted to present their rebuttal experts during their rebuttal case. Plaintiffs will not be permitted to call their rebuttal experts during their case in chief.

*Id.* The Court reaches the same conclusion in this case.[16]

---

[16] Plaintiffs' reliance on *AZ Holding, L.L.C. v. Frederick*, No. CV-08-0276-PHX-LOA, 2009 WL 2432745 (D. Ariz. Aug. 10, 2009), is misplaced because that case involved the imposition of sanctions under Rule 37. Plaintiffs' citation to *Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986), fares no better as the case involved a motion for default judgment.

Plaintiffs acknowledge that the sequence at trial is consistent with the order of expert disclosures: "the plaintiff's case-in-chief is followed by the defendant's case, and the plaintiff is then permitted to present a rebuttal case." Doc. 162 at 3. Plaintiffs assert that this sequence is not appropriate because Intel has engaged in "questionable litigation tactics" by "flipping" Dr. Schwartzberg, which purportedly had a "crescendo effect" on the timing and nature of expert disclosures. *Id.* at 3-5. But the record does not support this assertion.

Plaintiffs complain that Intel had the "last word" with its medical causation experts. *Id.* at 3. Plaintiffs incorrectly assert that Intel sought to extend the deadline for disclosing rebuttal experts, and Plaintiffs agreed to stagger the deadlines which gave Intel additional time to respond to Plaintiffs' causation experts. *Id.* at 4. In fact, Plaintiffs sought the extension because Dr. Johnson-Arbor "was not able to complete her expert rebuttal report" by the deadline. Doc. 53 at 2.

Plaintiffs further assert that Intel flipped Dr. Schwartzberg after Plaintiffs had disclosed him to say that the exposure event caused Alsadi's injuries. Doc. 162 at 3, 6. But Plaintiffs did not disclose Dr. Schwartzberg as an expert in this case. *See* Doc. 161-1. Instead, Plaintiffs disclosed Dr. Garcia as their sole causation expert. *Id.* at 3. The fact that Dr. Garcia's causation opinions are inadmissible, and Dr. Schwartzberg now believes that the exposure event could not have caused RADS, is no basis for allowing Plaintiffs to present rebuttal experts in their case-in-chief.

Plaintiffs have provided no factual or legal basis to present their rebuttal experts in their case-in-chief at trial or in opposition to Intel's summary judgment motion. The Court will grant Intel's motion to limit the testimony of Plaintiffs' rebuttal experts to Plaintiff's rebuttal case at trial.[17]

---

[17] Plaintiffs move to strike Intel's motion because "it is clear that Intel is seeking summary judgment relief, [and] summary judgment procedural and substantive rules apply." Doc. 154 at 1. No such relief is sought in Intel's motion. Instead, Intel has filed a separate summary judgment motion to which Plaintiffs have responded fully. Docs. 183, 195. Plaintiff's motion to strike will be denied.

1     **IV.**     **Intel's Motion for Summary Judgment.**

2          **A.**     **Summary Judgment Standard.**

3          Summary judgment is appropriate if the moving party shows that there is no genuine

4 dispute as to any material fact and the movant is entitled to judgment as a matter of law.

5 Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit

6 will preclude summary judgment, and the disputed evidence must be "such that a

7 reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

8 *Lobby, Inc.*, 477 U.S. 242, 248 (1986). The evidence must be viewed in the light most

9 favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

10 U.S. 574, 587 (1986), and all justifiable inferences are drawn in that party's favor because

11 "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from

12 the facts are jury functions," *Anderson*, 477 U.S. at 255.

13          **B.**     **Discussion.**

14          To establish his negligence claim, Alsadi must prove (1) a duty requiring Intel to

15 conform to a certain standard of care, (2) a breach of that duty by Intel, (3) a causal

16 connection between Intel's breach and Alsadi's injuries, and (4) actual damages. *See*

17 *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). Intel contends that summary judgment

18 is warranted because Intel owed no duty of care to Alsadi and he cannot show that Intel

19 breached any standard of care or caused his injuries. Doc. 183 at 3-14.

20          **1.**     **Duty.**

21          Duty is an "obligation, recognized by law, which requires the defendant to conform

22 to a particular standard of conduct in order to protect others against unreasonable risks of

23 harm." *Gipson*, 150 P.3d at 230 (citation omitted). "[D]uty in Arizona is based on either

24 recognized common law special relationships or relationships created by public policy."

25 *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 829 (Ariz. 2018) (citing *Gipson*, 150 P.3d at 231-

26 32). "Duties based on special relationships may arise from several sources, including

27 special relationships recognized by the common law, contracts, or 'conduct undertaken by

28 the defendant.'" *Id.* (quoting *Gipson*, 150 P.3d at 232).

The issue in this case is whether a special relationship existed between Alsadi and Intel that gave rise to a legal duty. Intel owns the Chandler campus, including the CH-8 building that houses the IWS. Doc. 196-3 at 6. Alsadi worked on the Chandler campus as an employee of JLL, not Intel. Intel notes, correctly, that an Arizona landowner generally "owes no non-delegable duty to the injured employee of a contractor . . . to provide a safe work place." *Rause v. Paperchine, Inc.*, 743 F. Supp. 2d 1114, 1122 (D. Ariz. 2010); *see Lee v. M & H Enters., Inc.*, 347 P.3d 1153, 1159 (Ariz. Ct. App. 2015) ("Wal-Mart, as the landowner, did not owe Lee a non-delegable duty of care . . . because he was working as an employee of an independent contractor at the time he sustained injuries.") (citing *Welker v. Kennecott*, 403 P.2d 330, 339 (1965)); *see also* Doc. 151 at 7-8.

Alsadi argues that Intel is liable for his injuries under Restatement (Second) of Torts § 414 (1965) because Intel retained some control over JLL's work. Docs. 117 at 9-11, 195 at 6-10. "Restatement § 414 addresses the direct liability of a landowner based on a theory of retained control:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the [landowner] owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

To trigger liability under Restatement § 414, a landowner 'must have retained some measure of control not over the premises of the work site, but over the actual work performed.'" *Lee*, 347 P.3d at 1159 (quoting *Lewis v. N.J. Riebe Enters., Inc.*, 825 P.2d 5, 11 (Ariz. 1992)).

Intel contends that JLL operates the IWS and Intel retains no direct control over the specific manner in which the work is done. Doc. 183 at 5-6 (citing *Pruett v. Precision Plumbing, Inc.*, 554 P.2d 655, 658-59 (Ariz. 1976)). In *Pruett*, the Arizona Supreme Court relied on comment (c) to § 414 in holding that the landowner could not be held liable where it controlled neither the method nor the details of the contractor's work. 554 P.2d at 658-59. The court later made clear in *Lewis*, however, that "[c]omment (c) does *not* say

27

that a [landowner] must control the day-to-day details of a contractor's work in order to be subject to liability under § 414." 825 P.2d at 12 (emphasis in original). Instead, comment (c) merely provides that the landowner "must have retained at least some degree of control over the manner in which the work is done[,]" such as "a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement § 414, cmt. (c). "[T]he appropriate test for retained control is found in comment (a) to § 414, which states that a [landowner] . . . may be liable under [§ 414] unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." *Lewis*, 825 P.2d at 12.

According to Intel, no jury reasonably could find that Intel retained sufficient control over JLL's work to be held liable under § 414. Doc. 183 at 6-10. The Court does not agree.

Scott Graunke, Intel's environmental health and safety manager, testified that Intel controls the mixture of chemicals used in the IWS, and JLL merely follows Intel's instructions. Doc. 196-3 at 14-15; *see* Doc. 159-13 ¶ 21. Graunke stated that $H_2S$ is a known IWS byproduct, and Intel controls the amount of $H_2S$ in the ambient air through various control systems Intel has in place, including direct exhaust, scrubbed exhaust, and general building room ventilation. Doc. 196-3 at 3-4. When Intel receives a health and safety complaint concerning a potential toxic emission, Intel will "err on the side of caution and . . . shut the area down if at all possible." *Id.* at 8. From this evidence, a reasonable jury could find that Intel retained at least "some measure of control" over JLL's operation of the IWS and $H_2S$ emissions. *Lewis*, 825 P.2d at 11.

Graunke and Robbie McGill, Intel's safety program manager, testified that when a chemical release occurs, Intel's emergency response team ("ERT") is responsible for making sure that all on the Chandler campus, including JLL employees, are directed out of the hazard zone and to an appropriate assembly point according to Intel's evacuation plans. *Id.* at 10-11; Doc. 196-6 at 5-6, 31. John McDonald, Intel's ERT leader, expects both Intel employees and contractors to follow his directions concerning evacuation assembly points.

Doc. 196-4 at 12. John Blood, one of Intel's manufacturing shift managers, explained that the ERT helps ensure that JLL employees perform their jobs safely. Doc. 196-5 at 7-8; *see also* Doc. 196-1 at 23. The failure to follow ERT's instructions can result in disciplinary action, including termination. Doc. 196-6 at 31; *see* Doc. 196-8 at 4.

A jury reasonably could find from this evidence that Intel "assume[d] affirmative duties with respect to [the] safety" of JLL employees – including Alsadi – and "retaine[d] sufficient control to be held liable under § 414 for the negligent exercise of its safety responsibilities." *Lewis*, 825 P.2d at 12. Intel asserts that it exercised no control over the evacuation and emergency response to the exposure event (Doc. 199 at 6-7), but this goes to whether Intel breached its safety responsibilities, not whether it had assumed those duties.

Intel further asserts that Plaintiffs have failed to create a triable issue as to whether Intel retained control over JLL's work based on the contract between Intel and JLL. Doc. 199 at 3-4. Contractual provisions may be relevant to the retained control determination, but they are not necessarily dispositive. *See Lewis*, 825 P.2d at 11. Moreover, McDonald confirmed that the contract between Intel and JLL required JLL employees to follow the directions given by Intel's ERT personnel and to comply with Intel safety standards. Doc. 196-3 at 6-9. Whether the contract supports a finding of retained control will be for the jury to decide.[18]

The issue of retained control under § 414 generally is "a *question of fact* which ordinarily should be left to the fact finder." *Lewis*, 825 P.2d at 11 (emphasis in original); *see Lee*, 347 P.3d at 1159. Construing the evidence in Plaintiffs' favor, a jury reasonably could find that Intel retained some control over the work that allegedly caused Alsadi's

---

[18] Intel objects to McDonald's testimony about the contractual provisions for lack of foundation, noting that Plaintiffs have not produced the contract. Doc. 199 at 4 & n.3. But a nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Orr v. Bank of Am.*, 285 F.3d 764, 774 (9th Cir. 2002). Plaintiffs may be able to lay sufficient foundation for McDonald's testimony at trial, and the contract itself could be admissible as a business record under Federal Rule of Evidence 803(6). *See United States v. Childs*, 5 F.3d 1328, 133-34 (9th Cir. 1993).

injuries. The Court will not grant summary judgment on the duty element of Alsadi's negligence claim. *See Rause*, 743 F. Supp. at 1132 (finding a triable issue as to whether a papermill's owner retained sufficient control over the work of a contractor to impose liability under § 414 where the owner had supervisors walking around the mill engaged in safety inspections and the supervisors had the right to correct any unsafe practices they observed); *Lewis*, 825 P.2d at 13 (the "negligent exercise of a right to prohibit or correct a subcontractor's unsafe work practice . . . impose[s] liability [under § 414] for an unsafe condition created by a subcontractor which injures an employee of that subcontractor"); *see also* Doc. 151 at 8-9.

### 2. Breach.

"Whether the defendant has met the standard of care – that is, whether there has been a breach of duty – is an issue of fact that turns on the specifics of the individual case." *Gipson*, 150 P.3d at 230. As noted, Plaintiffs disclosed Gerganoff to testify that Intel violated certain industry standards and thereby created an unsafe work environment. *See* Doc. 180 at 13. Intel asserts that summary judgment would be warranted if the Court were to grant Intel's *Daubert* motion challenging Gerganoff's opinions (Doc. 183 at 10), but for reasons stated above, the *Daubert* motion will be denied. The Court therefore will deny summary judgment on breach of the standard of care.

### 3. Causation.

In Arizona, "[t]he proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Coulbourn v. Air & Liquid Sys. Corp.*, No. CV-13-08141-PCT-SRB, 2015 WL 12656236, at *2 (D. Ariz. Feb. 11, 2015) (quoting *McDowell v. Davis*, 448 P.2d 869, 871 (Ariz. 1968)). "Causation is generally a question of fact for the jury[.]" *Id.* (quoting *Barrett v. Harris*, 86 P.3d 954, 958 (Ariz. Ct. App. 2004)). Only where the plaintiffs' evidence "does not establish a causal connection, leaving causation to the jury's speculation,' should the court remove this question from the

jury." *Benshoof v. Nat'l Gypsum Co.*, 978 F.2d 475, 476 (9th Cir. 1992) (quoting *Robertson v. Sixpence Inns of Am., Inc.*, 789 P.2d 1040, 1047 (Ariz. 1990)).

Intel contends that expert medical testimony is required to prove causation because an inference of a causal link between Alsadi's exposure to $H_2S$ and his injuries is beyond a layperson's common knowledge. Doc. 183 at 10-11. Intel relies on this statement in *Crystal Coca-Cola Bottling Co. v. Cathey*, 317 P.2d 1094, 1100 (Ariz. 1957): "Ordinarily[,] a jury would require expert medical evidence to help it to determine whether an illness resulted from particular acts." Doc. 183 at 11. But "[t]he soundness of this proposition depends upon the nature of the illness with which the jury is concerned." 317 P.2d at 1100.[19]

Plaintiffs argue that a layperson reasonably could infer from the evidence that Alsadi's exposure to $H_2S$ caused an injury, and summary judgment on causation is therefore not appropriate. Doc. 195 at 12. The Court agrees in part, and will require further briefing on remaining issues as described below.

The following facts are not genuinely disputed for purposes of summary judgment. On February 28, 2016, the IWS released $H_2S$. Doc. 184 ¶¶ 1, 13-14, 39. Alsadi was working nearby when the release occurred. *Id.* ¶ 15. He was evacuated to a designated assembly point directly across from the CH-8 building, where the IWS is housed, and smelled a strong "rotten egg" odor during the evacuation. *Id.* ¶¶ 23-29. He began experiencing a tingly throat, light cough, and headache, and reported these symptoms to McDonald. *Id.* ¶¶ 32, 35. McDonald noticed that Alsadi had very glossy and watery eyes.

---

[19] The other cases Intel cites are inapposite. *See Ryan v. San Francisco Peaks Trucking Co.*, 262 P.3d 863, 870 (Ariz. Ct. App. 2011) (expert testimony required in medical malpractice cases under A.R.S. § 12-563); *W. Bonded Prods. v. Indus. Comm'n of Ariz.*, 647 P.2d 657, 658 (Ariz. Ct. App. 1982) (expert testimony required in workers' compensation cases where the result of the industrial accident is not apparent); *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994) (affirming summary judgment on Federal Employer's Liability Act claims where the plaintiffs presented "no evidence that workplace exposure to chemicals played any part, no matter how small, in causing their injuries"); *Rhodes v. Energy Marine LLC*, No. CV-14-08206-PCT-JJT, 2016 WL 6700973, at *4 (D. Ariz. Nov. 15, 2016) (requiring expert testimony on the cause of an explosion because the explosion "[did] not speak for itself").

Doc. 196-4 at 19-20. Two other JLL employees reported similar symptoms. *Id.*; Doc. 184 ¶ 36. Alsadi and his coworkers were evaluated by a nurse and then taken to an urgent care facility for treatment. Doc. 184 ¶¶ 37-38.

Alsadi states that he had no significant health history or respiratory problems when he arrived at work on the night in question. Doc. 197-1 ¶ 36. As noted, he smelled a rotten egg odor during the evacuation and immediately began experiencing physical symptoms. Gerganoff states in his report that $H_2S$ is an inhalation hazard that has a rotten egg odor. Doc. 164-4 at 2.[20]

Accepting this evidence as true, a jury reasonably could find, without the benefit of expert medical testimony, that Alsadi was exposed to $H_2S$ and the exposure caused a toxic inhalation injury. *See Cathey*, 317 P.2d at 1100 ("[A] reasonable person does not require the aid of expert medical evidence in order to determine that the discovery of a fly in a mouthful of Coca-Cola caused the vomiting which immediately followed the discovery.").[21] The Court will deny summary judgment to the extent Intel argues that the evidence does not support a finding that Intel caused Alsadi any injury.

Intel contends that even if it were apparent to a layperson that the $H_2S$ exposure caused Alsadi's initial symptoms, those same symptoms cannot be bootstrapped into proof that the exposure caused RADS. Docs. 183 at 11-12, 199 at 7-11. In its reply brief, Intel cites several cases requiring expert testimony to show that a chemical exposure caused

---

[20] Intel challenges some of Gerganoff's opinions, as discussed above, but does not dispute that $H_2S$ is a hazardous gas that smells like rotten eggs. *See* 40 C.F.R. pt. 355 (EPA regulation listing $H_2S$ as an "extremely hazardous substance"); *St. Bernard Citizens For Envtl. Quality, Inc. v. Chalmette Ref., L.L.C.*, 399 F. Supp. 2d 726, 737 n.5 (E.D. La. 2005) (noting that $H_2S$ is a "hazardous gas[] with a pungent odor often described as similar to rotten eggs") (citing 40 C.F.R. pt. 355); *see also* U.S. Department of Labor, OSHA, https://www.osha.gov/SLTC/hydrogensulfide/hazards.html (stating that the rotten egg odor from $H_2S$ is first noticeable at 0.01-1.5 ppm) (last visited Sept. 20, 2019).

[21] Such a finding by the jury would be consistent with the testimony of Dr. Steven Pike, one of Intel's medical experts. Dr. Pike testified that even at low concentrations, $H_2S$ can cause cough and throat irritation. Doc. 196-12 at 3. He further stated that eye irritation is one of the best indicators of $H_2S$ above 50 ppm. *Id.* He opined in his initial report that Alsadi "most probably suffered an inhalation injury that lasted no less than 24 hours and likely up to at least a week[.]" *Id.* at 4.

RADS.  Doc. 199 at 8 (citing *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 702 (7th Cir. 2015) (affirming summary judgment where the plaintiff had no admissible expert opinion that his exposure to chlorine gas caused RADS); *Kolesar* 412 F. Supp. 2d at 696 (requiring the plaintiff to present expert testimony that his exposure to metam sodium fertilizer caused RADS "because the effects of toxic chemical exposure are complex and not within the ken of ordinary experience"); *Byous v. L.M. Scofield Co.*, No. 3:07-CV-053-JTC, 2009 WL 10664903, at *10 (N.D. Ga. Jan. 27, 2009) ("Plaintiffs . . . cannot prove that the Cureseal-S vapors caused [the plaintiff's] RADS without expert testimony."); *Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 36-39 (Tex. App. 2004) ("Expert testimony is particularly necessary in chemical-exposure cases, in which medically complex diseases and causal ambiguities compound the need for expert testimony").

The Court is inclined to agree with the Seventh Circuit's observation that "a typical layperson does not possess the requisite knowledge to draw a causative line, without the assistance of a medical expert, between a brief encounter with [a toxic] gas and the onset of . . . RADS[,] a disease with which . . . most lay people have no familiarity[.]" *Higgins*, 794 F.3d at 702.  The Court therefore is inclined to grant summary judgment on the issue of whether Alsadi's exposure to $H_2S$ caused RADS.  Under Arizona law, "where the plaintiffs' evidence does not establish a causal connection, leaving causation to the jury's speculation," the Court should "remove this question from the jury." *Benshoof*, 978 F.2d at 476.  Without an admissible expert opinion that the $H_2S$ exposure caused RADS, any jury award of damages for RADS would be based on causation speculation.  But because Intel did not address the cases cited above until its reply brief, the Court will give Plaintiffs an opportunity to address the cases and explain why expert testimony may not be necessary to establish a causal link between the exposure event and Alsadi's alleged RADS.

The Court will require supplemental briefing on an additional issue.  The Court concludes above that Plaintiffs do not need an expert to show that Alsadi's injuries on the night in question and immediately thereafter were caused by the $H_2S$ exposure.  If, after the supplemental briefing, the Court concludes that Plaintiffs cannot recover for RADS

without an expert opinion, what is the extent of damages Plaintiffs can seek at trial? Where does the Court draw the line between injuries for which Plaintiffs can recover without a causation expert and injuries for which such an expert is required? The Court does not merely seek the parties' logical arguments on this issue, but the governing legal principles.[22]

## C. Summary Judgment Conclusion.

The Court will deny Intel's motion for summary judgment on Alsadi's negligence claim with respect to the issues of duty and breach, and deny the motion in part as to whether Intel caused Alsadi an injury. Given this ruling, summary judgment is not warranted on the derivative claim for loss of consortium. *See* Doc. 183 at 3; *Barnes v. Outlaw*, 964 P.2d 484, 486-87 (Ariz. 1998) (loss of consortium is a derivative claim requiring proof of the underlying cause of action).

**IT IS ORDERED:**

1. Intel's motion to limit testimony of Plaintiffs' rebuttal experts (Doc. 144) is **granted**.

2. Intel's *Daubert* motion to exclude opinions of Dr. Garcia (Doc. 145) is **granted**. Dr. Garcia is precluded from offering his causation opinions and his prognosis opinion that Alsadi is at risk for lung disease and may need a lung transplant in the future.

3. Intel's *Daubert* motion to exclude opinions of Dr. Landers (Doc. 146) is **granted in part and denied in part**. Dr. Landers is precluded from offering his causation opinion, but may testify regarding his diagnosis of RADS and Alsadi's prognosis.

---

[22] Intel contends that Alsadi's symptoms were transient (Doc. 199 at 7), but does not explain when the symptoms ceased. Intel instead focuses its causation arguments on Alsadi's alleged RADS, without addressing what other damages Plaintiffs may recover. Similarly, Plaintiffs argue that there is no dispute that Alsadi was injured as a result of the exposure event, and that the dispute concerns the diagnosis and duration of his injuries. Doc. 195 at 12. But Plaintiffs do not address the extent to which the jury may award damages for Alsadi's injuries absent expert testimony on causation of RADS. If the Court rules that Plaintiffs cannot recover damages for RADS, it must decide where the line should be drawn between recoverable and unrecoverable damages in light of its *Daubert* and rebuttal expert rulings.

4.     Intel's *Daubert* motion to exclude the opinions of Dr. Johnson-Arbor (Doc. 147) is **granted**.

5.     Intel's *Daubert* motion to exclude the opinions of Greg Gerganoff (Doc. 163) is **denied**.

6.     Plaintiffs' motion to strike Intel's untimely sixth supplemental disclosure statement under Rule 37(c)(1) (Doc. 200) is **denied** because the motion is not proper under Local Rule 7.2(m).  The other motions to strike (Docs. 154-55, 159-61, 167, 187) are **denied**.

7.     Intel's motion for summary judgment (Doc. 183) is **denied in part** as set forth above.

8.     The parties shall simultaneously file memoranda, not to exceed seven pages in length, addressing the causation and damages issues described above by **October 14, 2019**.

Dated this 30th day of September, 2019.

David G. Campbell
Senior United States District Judge